IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JOSEPH PRUITT,

        Plaintiff,               CIV. S. 05-1205 GGH

    vs.

JO ANNE B. BARNHART,       <u>ORDER</u>
Commissioner of Social Security,

        Defendant.
_____/

        Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying plaintiff's application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"). For the reasons that follow, plaintiff's Motion for Summary Judgment is granted in part, and the Commissioner's Motion for Summary Judgment is denied. The Clerk is directed to enter judgment for the plaintiff, and this matter is remanded to the Commissioner for further development of the record.

<u>BACKGROUND</u>

        Plaintiff, born July 7, 1954, applied for disability benefits on December 21, 2001. (Tr. at 71-73.) Plaintiff alleged he was unable to work since January 1, 1989 due to back pain, osteoarthritis of right knee, arthritis of the hands and feet, and depression. (Tr. at 71, 102, 28.) In a decision dated October 20, 2003, ALJ L. Kalei Fong determined that plaintiff was not

disabled.[1]  The ALJ made the following findings:

> 1.   The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

> 2.   The claimant's mechanical back pain and tailbone pain, osteoarthritis of both knees, depression, and alcohol dependence in sustained full remission are severe impairments in the Regulations (20 CFR §§ 416.921).[2]

\\\\\

---

[1]  Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. § 401 et seq.   Supplemental Security Income is paid to disabled persons with low income.  42 U.S.C. § 1382 et seq.  Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ." 42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A).  A parallel five-step sequential evaluation governs eligibility for benefits under both programs.  See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S. 137, 140-142, 107 S. Ct. 2287 (1987).  The following summarizes the sequential evaluation:
> Step one:  Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.
> Step two:  Does the claimant have a "severe" impairment?  If so, proceed to step three.  If not, then a finding of not disabled is appropriate.
> Step three:  Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1?  If so, the claimant is automatically determined disabled.  If not, proceed to step four.
> Step four:  Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five.
> Step five:  Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled.

Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).
    The claimant bears the burden of proof in the first four steps of the sequential evaluation process.  Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5.  The Commissioner bears the burden if the sequential evaluation process proceeds to step five.  Id.

[2]  The ALJ's listing of impairments is erroneous.  Pain, itself, is a symptom of an impairment, not an impairment itself.  Plaintiff must show the existence of an objective injury or ailment, e.g. arthritis, slipped disc etc.  Ukolov v. Barnhart, 420 F.3d 1002, 1005 (9th Cir. 2005).  Moreover, listing alcoholism in full remission as a severe impairment is oxymoronic.  That is, fully remitted alcoholism by definition could not have more than a minimal effect on a person's ability to work because remitted alcoholism indicates the absence of the deleterious effects of alcoholism.  While plaintiff may always be considered an alcoholic because of his past addiction, he is not presently suffering its ill effects.  However, because the parties do not raise this issue, the court need not consider it further.

3.      These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

4.      The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

5.      The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairment (20 CFR §§ 416.927).

6.      The claimant retains the residual functional capacity to perform a wide range of unskilled medium work.  In an 8-hour workday, he could sit for 6 hours and stand and/or walk for 6 hours.  He could lift 25 pounds frequently and up to 50 pounds occasionally.  He could occasionally climb, stoop, kneel, crawl, or crouch.

7.      The claimant's past relevant work as a prep/fry cook did not require the performance of work-related activities precluded by his residual functional capacity (20 CFR 416.965).

8.      The claimant's medically determinable mechanical back pain and tailbone pain, osteoarthritis of the bilateral knees, depression, and alcohol dependence in sustained full remission do not prevent the claimant from performing his past relevant work.

9.      The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of the decision (20 CFR §§ 416.920(e)).

(Tr. at 36.)[3]

ISSUES PRESENTED

Plaintiff has raised the following issues: A.  Whether the ALJ Failed to Give Clear and Convincing Reasons for Rejecting Plaintiff's Testimony Regarding the Severity of His Symptoms; B.  Whether the ALJ Failed to Give Specific and Legitimate Reasons for

---

[3]  Plaintiff had previously applied for disability in 1997, but was denied in 1999.  (Tr. at 46-49.)  ALJ Fong found that there was no basis for reopening the decision on the prior re-application, but that Acquiescence Ruling 97-4(9) was applicable.  (Tr. at 27-28.)  As such, the presumption of continuing non-disability had been rebutted because there had been a change in rule for determining disability where there were musculoskeletal disorders and because plaintiff had alleged a new impairment.  (Id. at 31.)

1  Disregarding the Opinions of the Consultative Examiners and State Agency Physicians; C.

2  Whether the ALJ Overlooked Evidence Regarding Side Effects of Medication in Determining

3  Plaintiff's Residual Functional Capacity; D.  Whether the ALJ Improperly Ignored Lay Witness

4  Testimony; and E.  Whether the ALJ's Step Four Vocational Finding Lacked Substantial

5  Evidence.

6  LEGAL STANDARDS

7          The court reviews the Commissioner's decision to determine whether (1) it is

8  based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in

9  the record as a whole supports it. Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir.1999).

10  Substantial evidence is more than a mere scintilla, but less than a preponderance.  Saelee v.

11  Chater, 94 F.3d 520, 521 (9th Cir. 1996).  "'It means such evidence as a reasonable mind might

12  accept as adequate to support a conclusion.'"  Richardson v. Perales, 402 U.S. 389, 402, 91 S. Ct.

13  1420 (1971), quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229, 59 S. Ct. 206

14  (1938).  "The ALJ is responsible for determining credibility, resolving conflicts in medical

15  testimony, and resolving ambiguities."  Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir.

16  2001) (citations omitted).  "Where the evidence is susceptible to more than one rational

17  interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld."

18  Thomas v. Barnhart, 278  F.3d 947, 954 (9th Cir. 2002).

19  ANALYSIS

20      A.  Whether the ALJ Rejected Plaintiff's Testimony Without Providing Legally Sufficient

21  Reasons

22          Plaintiff asserts that the ALJ improperly rejected his allegations regarding the

23  severity of his mental impairments and knee osteoarthritis, due to a lack of medical evidence.

24          The ALJ determines whether a disability applicant is credible, and the court defers

25  to the ALJ who used the proper process and provided proper reasons.  See, e.g., Saelee v. Chater,

26  94 F.3d 520, 522 (9th Cir. 1995).  If credibility is critical, the ALJ must make an explicit

4

1  credibility finding.  Albalos v. Sullivan, 907 F.2d 871, 873-74 (9th Cir. 1990); Rashad v.

2  Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990) (requiring explicit credibility finding to be

3  supported by "a specific, cogent reason for the disbelief").

4  　　　　　In evaluating whether subjective complaints are credible, the ALJ should first

5  consider objective medical evidence and then consider other factors.  Bunnell v. Sullivan, 947

6  F.2d 341, 344 (9th Cir.1991) (en banc).  The ALJ may not find subjective complaints incredible

7  solely because objective medical evidence does not quantify them.  Id. at 345-46.  If the record

8  contains objective medical evidence of an impairment possibly expected to cause pain, the ALJ

9  then considers the nature of the alleged symptoms, including aggravating factors, medication,

10  treatment, and functional restrictions.  See id. at 345-47.  The ALJ also may consider the

11  applicant's: (1) reputation for truthfulness or prior inconsistent statements; (2) unexplained or

12  inadequately explained failure to seek treatment or to follow a prescribed course of treatment;

13  and (3) daily activities.[4]  Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996); see generally

14  SSR 96-7P, 61 FR 34483-01; SSR 95-5P, 60 FR 55406-01; SSR 88-13.  Work records, physician

15  and third party testimony about nature, severity, and effect of symptoms, and inconsistencies

16  between testimony and conduct, may also be relevant.  Light v. Social Security Administration,

17  119 F.3d 789, 792 (9th Cir. 1997).  The ALJ may rely, in part, on his or her own observations,

18  see Quang Van Han v. Bowen, 882 F.2d 1453, 1458 (9th Cir. 1989), which cannot substitute for

19  medical diagnosis.  Marcia v. Sullivan, 900 F.2d 172, 177, n.6 (9th Cir. 1990).  Absent

20  affirmative evidence demonstrating malingering, the reasons for rejecting applicant testimony

21  must be clear and convincing.  Morgan v. Commissioner of Social Sec. Admin., 169 F.3d 595,

22  599 (9th Cir. 1999).

23

24  　　　[4] Daily activities which consume a substantial part of an applicants day are relevant.
"This court has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily
25  activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in
any way detract from her credibility as to her overall disability.  One does not need to be utterly
26  incapacitated in order to be disabled."  Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001)
(quotation and citation omitted).

1    Here, the ALJ found, *as one factor*, plaintiff to be only partially credible because

2   the evidence did not fully support his allegations.  The ALJ discussed his other reasons:

3          Although the claimant alleged disability, in part, due to back and
           tailbone pain, he reported to Dr. Nuccion in March 2002 that he
4          initially received chiropractic treatment for his symptoms but has
           not received any treatment in the past 10 years.  Although the
5          claimant reported to Dr. Spin that he occasionally takes his
           mother's Vicodin with some relief of back pain, his personal
6          physicians have not prescribed any of the strong narcotic pain
           medication one would expect to see in the treatment of intractable
7          and disabling pain.  At the hearing the claimant testified that his
           medications include Celebrex, Flexeril, and over-the counter
8          Aleve.  During the current period, the claimant has not required
           urgent care or emergency room treatment for symptoms associated
9          either with his back, tailbone, or knee impairments and no surgery
           has been recommended for any of these conditions.  Dr. Nuccion
10         and Dr. Sin reported that the claimant walks with normal gait and
           with no need of assistive device.  The claimant's allegations of
11         disability are inconsistent with his ability to perform activities of
           daily living.

12

13   (Tr. at 34.)

14    Contrary to plaintiff's specific claim that the ALJ improperly discounted his knee

15   problems, the ALJ in fact discussed this problem in detail and explained why it was not as

16   disabling as plaintiff had alleged.[5]  For example, the ALJ noted that although plaintiff had been

17   diagnosed with osteoarthritis in his right knee, he did not receive formal physical therapy, did not

18   wear a brace, and had had no surgery.  Plaintiff's only medication was Aleve, which is over the

19   counter, and his only treatment was icing his knee and modifying his activity.  (Tr. at 28.)

20   Furthermore, the ALJ summarized the opinion of Dr. Nuccion, an orthopedist.  There was no

21   atrophy in the right leg.  Plaintiff could sit, stand, and walk with normal posture, and did not need

22   an assistive device to walk with a normal gait.  (Id.)  Straight leg raising in the seated and supine

23   position was negative, and range of motion of the knees was normal.  Although the lower right

24   ────────────────

25      [5] Some of plaintiff's impairments stem from two accidents.  In 1975, plaintiff was in a
     motor vehicle accident in which he suffered a left femur fracture and punctured liver.  In 1989,
26   he slipped on a soapy floor while working at Taco Bell.  (Tr. at 191, 156.)

1  extremity revealed decreased sensation to light touch, motor strength and reflexes were normal in

2  all extremities.  (Tr. at 28-29.)  The ALJ also acknowledged Dr. Nuccion's diagnosis of right

3  knee patellofemoral syndrome, and Dr. Spin's diagnosis of osteoarthritis in the knees, but relied

4  on both physicians' opinions that plaintiff could do medium work except for only occasional

5  crouching, stooping, bending, climbing, and kneeling, and the need to take breaks or alternate

6  positions.  (Id. at 29.)  A later x-ray of the right knee is consistent with these opinions.  On

7  January 21, 2003, the report indicated developing arthritis at the medial knee joint margins.  (Id.

8  at 248.)

9        The ALJ further discussed plaintiff's daily activities, which included caring for

10  his personal needs, doing crossword puzzles, reading, watching television, carrying out trash,

11  doing yard work for two hours at a time, which includes mowing, raking, dumping cuttings, and

12  watering, and taking short walks.  (Id. at 31, 33.)

13        Dr. Spin noted decreased range of motion in both knees, and diagnosed

14  osteoarthritis.  (Id. at 230.)  He opined that plaintiff did not need an assistive device to walk.  (Id.

15  at 231.)  In consideration of his patellofemoral syndrome, Drs. Nuccion and Spin limited

16  plaintiff's climbing, stooping, kneeling, and crawling.  (Id. at 227, 195.)

17        The record supports this summary of plaintiff's knee impairment.  In addition to

18  the above assessment of Dr. Nuccion's report, the evaluation also states in regard to the right

19  knee that there is negative patella grind and negative patella inhibition.  (Id. at 194.)  Although

20  plaintiff did not have a very irritable patellofemoral joint, he did have crepitants with range of

21  motion.  (Id. at 195.)

22        Plaintiff's only meritorious contention is his claim that he did not seek some

23  treatment because he did not have the funds.  Social Security Ruling 82-59 provides in relevant

24  part (emphasis added):

25        Individuals with a disabling impairment which is amenable to treatment
         that could be expected to restore their ability to work must follow the
26        prescribed treatment to be found under a disability, unless there is a

7

justifiable cause for the failure to follow such treatment ...

The underlying regulation, 20 C.F.R. § 416.930 (and companion regulation 20 C.F.R. § 404.1530 under Title II) similarly provides:

(b) When you do not follow prescribed treatment. If you do not follow the prescribed treatment without a good reason, we will not find you disabled ...

Both 20 C.F.R. § 416.930 and SSR 82-59 identify specific acceptable reasons for declining to following prescribed treatment.

20 C.F.R. § 416.930(c) sets forth the following examples of acceptable reasons for declining to following prescribed treatment:

(1) The specific medical treatment is contrary to the established teaching and tenets of your religion.
(2) The prescribed treatment would be cataract surgery for one eye when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment.
(3) Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment.
(4) The treatment because of the enormity (e.g. open heart surgery), unusual nature (e.g. organ transplant), or other reason is very risky for you; or
(5) The treatment involves amputation of an extremity, or a major part of an extremity.

Additional acceptable reasons for declining to following prescribed treatment set forth in SSR 82-59 are:

(1) Fear of surgery;
(2) *Inability to pay for prescribed treatment*;
(3) A medical source has advised against the treatment.

Social Security Ruling 82-59 "only appl[ies] to claimants who would otherwise be disabled within the meaning of the Act." Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995). The ALJ failed to make a specific finding that plaintiff was not disabled without regard to his failure to seek treatment. In fact, the ALJ found in part that plaintiff's credibility was suspect due to his lack of chiropractic treatment in the last ten years. (Tr. at 34.) This finding was error in light of SSR 82-59 which permits an exception for failing to follow treatment due to inability

1  to pay for it.

2            The ALJ did not specifically reject plaintiff's credibility in regard to his mental

3  impairment, but did address it satisfactorily.  During his February 23, 2002, evaluation with Dr.

4  Abrinko, plaintiff related, as correctly summarized by the ALJ, that he is able to do household

5  chores, shops only if his sister goes with him because he does not like to be around the public,

6  but can go out alone, cooks, and takes care of his personal hygiene.  (Tr. at 30, 200.)  This

7  psychiatrist diagnosed major depression with anxious features, chronic, moderate, but assigned a

8  GAF score of 65.[6]  (Id. at 30, 202.)  He concluded that plaintiff could follow simple and complex

9  and detailed instructions but would have moderate difficulty dealing with others.  He was found

10  to be not significantly limited in ability to maintain concentration, persistence and pace, or in

11  ability to perform work without special supervision.  (Id. at 30, 203.)  Plaintiff was moderately

12  limited in ability to associate with day-to-day work activity, adapt to stresses of a work

13  environment, and attend and perform work activities on a consistent basis.  (Id. at 203.)

14            Dr. Canty also assessed plaintiff in October, 2002, and as summarized by the ALJ,

15  he thought plaintiff might have some difficulty with complex tasks, and should avoid interaction

16  with the public, but could accept instructions from supervisors and work with a limited number

17  of coworkers.  (Id. at 30, 235.)  Plaintiff's GAF score at this time was 65.  (Id. at 234.)  Based on

18  plaintiff's history of poor work attendance, Dr. Canty thought it was unlikely plaintiff could do

19  work activities on a consistent basis or attend work on a regular basis.  (Id. at 235.)

20            Based on these most recent assessments, and the opinion of both practitioners that

21  plaintiff's memory was intact and his thought process coherent and organized, the ALJ concluded

22  that plaintiff had mild to moderate difficulties in maintaining social functioning and maintaining

23

24          [6]  GAF is a scale reflecting the "psychological, social, and occupational functioning on a
    hypothetical continuum of mental health-illness." Diagnostic and Statistical Manual of Mental
    Disorders 32 (4th ed.1994) ("DSM IV").  A GAF of 61-70 indicates "some mild symptoms (e.g.,
25  depressed mood and mild insomnia) or some difficulty in social, occupational, or school
    functioning (e.g., occasional truancy, or theft within the household), but generally functioning
26  pretty well, has some meaningful interpersonal relationships."  DSM IV.

1   concentration, persistence, or pace.  (Id. at 33.)  The ALJ added that there was no evidence in the

2   record of repeated or extended episodes of decompensation or deterioration as a result of any

3   mental impairment, and therefore plaintiff's mental impairments were severe but did not meet the

4   listings.  (Id. at 34.)

5          Plaintiff points to other records indicating a seemingly worse mental condition;

6   however, these records are older and do not reflect plaintiff's most recent condition.  On April

7   20, 1998, it is true that plaintiff was assigned a GAF score of 45;[7] however, at that time plaintiff

8   was diagnosed with alcohol abuse and reported that he was hearing voices.  (Tr. at 183-84.)  He

9   was also having suicidal thoughts and had acted on them twice, in the 1980s.  (Id. at 199.)  At

10  this time, plaintiff had only stopped drinking five months earlier, according to his report.  (Id. at

11  183-84.)  Other records show plaintiff's GAF score was 50 in December, 2000.  (Id. at 171.)

12  Nevertheless, both Drs. Abrinko and Canty assessed a GAF score of 65 in 2002, indicating that

13  plaintiff's condition had improved greatly.

14         In regard to plaintiff's claim that he was diagnosed with bipolar disorder, that

15  diagnosis was made on only one occasion, March 25, 1998, close in time to plaintiff's alcohol

16  abuse and low GAF scores.  (Tr. at 185.)  There has been no recent diagnosis or treatment for this

17  illness.[8]

18  _____

19      [7] According to the DSM IV, a GAF of 41-50 indicates: "Serious symptoms (e.g., suicidal
     ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social,
20   occupational, or school functioning (e.g., no friends, unable to keep a job)."

21      [8] Furthermore, bipolar disorder is not necessarily disabling as plaintiff implies:

22      Of course, bipolar disorder encompasses depression; thus it would be somewhat
        misleading to characterize bipolar disorder as a disease entirely separate from
23      depression.  Bipolar disorder, also known as manic-depressive illness, is a brain
        disorder that causes unusual shifts in a person's mood, energy, and ability to
24      function.  Different from the normal ups and downs that everyone goes through,
        the symptoms of bipolar disorder are severe.  They can result in damaged
25      relationships, poor job or school performance, and even suicide.  But there is good
        news: bipolar disorder can be treated, and people with this illness can lead full and
26      productive lives.

1    Based on the ALJ's rejection of plaintiff's credibility due to failure to undergo

2    chiropractic treatment in the last ten years despite plaintiff's lack of finances, his credibility

3    finding regarding plaintiff's right knee ailment is not supported by substantial evidence.

4        B.  Listing 12.04

5        Plaintiff contends that the ALJ erred in failing to find that he meets listing 12.04.

6    The "Listing of Impairments" ("Listings") describe various impairments of thirteen bodily

7    systems, which presumptively preclude a person from working.  20 C.F.R. Pt. 404, Subpt. P,

8    App. 1.  See Young v. Sullivan, 911 F.2d 180, 183 (9th Cir. 1990); 20 C.F.R. § 404.1520(d).  At

9    the third step of the disability analysis, the ALJ determines whether a person's condition either

10   "meets" or "equals" a listing.  A mere *diagnosis* of a listed impairment is not sufficient.  Specific

11   findings included in each listing also must be met.  See, e.g., Key v. Heckler, 754 F.2d 1545,

12   1550 (9th Cir. 1985).  Alternatively, other diagnostic tests, or the combined effects of various

13   conditions, may demonstrate the "equivalent" of the specific required findings.  See, e.g.,

14   Sullivan v. Zebley, 493 U.S. 521, 531 (1990); Marcia v. Sullivan, 900 F.2d 172 (1990).  In sum,

15   however, unless an impairment is as severe as and has lasted as long as described in the listing, a

16   person is not presumptively disabled.  Young, 911 F.2d at 183.

17       Plaintiff argues his condition met or equaled Listing 12.04, for affective disorders.

18   In support of this claim, plaintiff continues to cite older mental health records indicating GAF

19   scores between 44 and 50, notes of past suicide attempts, hearing voices, and plaintiff's

20   subjective complaints.  These records have been summarized in the previous section, and

21   plaintiff's most recent mental health records show significant improvement, indicating that

22   _____

23                                          ***

         Bipolar disorder causes dramatic mood swings—from overly "high" and/or
24       irritable to sad and hopeless, and then back again, often with periods of normal
         mood in between. Severe changes in energy and behavior go along with these
25       changes in mood. The periods of highs and lows are called **episodes** of mania and
         depression.

26   National Institutes of Mental Health, www.nimh.nih.gov/publicat/bipolar.

1  plaintiff's earlier condition was not permanent.

2          The ALJ did consider listings for mental impairment but found that plaintiff did

3  not meet or equal them because there was no evidence of repeated or extended episodes of

4  decompensation or deterioration.  (Tr. at 34.)  Both Drs. Abrinko and Canty opined that

5  plaintiff's mental problems would not preclude him from working.  (Id. at 203, 234-35.)

6  Furthermore, two DDS physicians expressly declined to find that plaintiff met listing 12.04.  (Id.

7  at 215, 219-223.)

8          An ALJ need not discuss separately each of several listings which might apply to

9  a case.  The ALJ is under no duty to specifically "state why a claimant failed to satisfy every

10  different section of the listing of impairments."  Gonzales v. Sullivan, 914 F.2d 1197, 1201 (9th

11  Cir.1990).  The regulations merely require the Commissioner to "review the symptoms," 20

12  C.F.R. § 404.1526, and make specific findings essential to the conclusion.  Gonzales, 914 F.2d at

13  1200.  This the ALJ did.  In her decision she considered, evaluated, and resolved contradictions

14  in the reports concerning plaintiff's psychiatric condition.  It is her function to resolve

15  contradictory medical opinions.

16          The ALJ's finding that plaintiff did not meet or equal the listings is based on the

17  proper legal standards and is supported by substantial evidence in the record.

18          C.  Whether the ALJ Failed to Provide Legitimate Reasons for Rejecting Portions of

19  Various Medical Opinions

20          Plaintiff contends that the ALJ failed to include all the limitations imposed by Dr.

21  Nuccion, Dr. Spin, Dr. Abrinko, and the DDS doctor who performed a psychiatric review.

22          The opinion of an examining physician is, in turn, entitled to
           greater weight than the opinion of a nonexamining physician.
23          Pitzer v. Sullivan, 908 F.2d 502, 506 (9th Cir.1990); Gallant v.
           Heckler, 753 F.2d 1450 (9th Cir.1984). As is the case with the
24          opinion of a treating physician, the Commissioner must provide
           "clear and convincing" reasons for rejecting the uncontradicted
25          opinion of an examining physician.

26  Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996).

1    First, plaintiff correctly asserts that the ALJ, although fully crediting Dr.

2    Nuccion's opinion, excluded this doctor's limitations of need to alternate between sitting and

3    standing every hour, and limitation on left upper extremity fine manipulation without

4    explanation.  Here, the ALJ appeared to accept only the limitations assessed in common by both

5    Drs. Nuccion and Spin.  The ALJ stated, "both doctors [Nuccion and Spin] assessed that the

6    claimant could stand and/or walk for 6 hours in an 8-hour workday.  ... both doctors assessed

7    that the claimant could sit for 6 hours in an 8-hour workday.  Dr. Nuccion assessed that the

8    claimant could lift and/or carry 25 pounds frequently and 50 pounds occasionally.  Dr. Spin

9    assessed that the claimant could lift and/or carry 10-25 pounds frequently and 20-50 pounds

10   occasionally." (Tr. at 32.)  As a result, the ALJ found that plaintiff could do his past work as fry

11   cook or cook helper because these jobs, although medium work, did not require more than

12   occasional climbing, stooping, kneeling, crawling and crouching.  (Tr. at 35.)

13   In regard to the left trigger finger limitation assessed by Dr. Nuccion, the ALJ

14   noted Dr. Nuccion's finding that plaintiff could make a full fist in any event, and his range of

15   motion was not limited in his hands.  (Tr. at 29, 195.)  He also explained that there were no

16   clinical findings or diagnosis of impairment in plaintiff's hands.  (Id. at 32.)  Furthermore, Dr.

17   Spin opined that plaintiff had no significant manipulative limitations, and the DDS physician, Dr.

18   Dipsia, concluded that plaintiff had no manipulative limitations.  Although "[a]n ALJ is not

19   entitled to pick and choose through a physician's opinion," Sklenar v. Barnhart, 195 F. Supp. 2d

20   696, 703 n.6 (W.D.Pa. 2002) (citations and quotation omitted), he may give specific and

21   legitimate reasons for declining to adopt part of an opinion.  See Magallanes v. Bowen, 881 F.2d

22   747, 755 (9th Cir. 1989) (declining to adopt physician's opinion about onset date).

23   The ALJ gave a satisfactory reason for disregarding the left finger limitation

24   proposed by Dr. Nuccion, and substantial evidence in the record supported his decision.

25   The ALJ did not address Dr. Nuccion's recommended limitation of needing to

26   alternate between sitting and standing every hour, or Dr. Spin's recommendation that plaintiff be

able to take breaks every two hours.  The only other opinion on plaintiff's physical RFC was that of the DDS evaluator, Dr. Dipsia, who did not place any such restrictions on plaintiff, but instead limited plaintiff to only light work, an opinion on which the ALJ did not rely.  Objective evidence supporting the need to take breaks or alternate sitting and standing, in addition to the knee films described in the first section, is an x-ray of the lumbar spine on January 21, 2003, which indicates modest osteophytes at the L4 and L5 vertebral body anterior margins.  There was also "considerable narrowing and unsharpness of the margins of the left sacroiliac joint, raising the question of arthritic changes developing at that level."[9]  (Tr. at 249.)  The ALJ erred in failing to provide any reasons for disregarding these limitations provided by Drs. Nuccion and Spin. The ALJ also failed to address plaintiff's limitation of only occasional bending, as recommended by Dr. Spin, and thus erred in this regard also.  The effect of these failures will be addressed in the last section.

Plaintiff next claims that the ALJ did not consider plaintiff's mental limitations in determining his residual functional capacity, including limited ability to relate to others, moderately limited ability to adapt to stresses in the workplace, and moderately limited ability to maintain regular attendance and perform work consistently.  These areas, as well as the practitioners' opinions upon which they are based, have already been discussed in the previous sections.  The ALJ noted the limitations and concluded that plaintiff did not require a highly structured environment, has not had repeated extended episodes of decompensation, and a minimal change in his environment would not cause his condition to deteriorate.  (Tr. at 33-34.) The ALJ gave clear and convincing reasons to reject these mental limitations.

\\\\\

\\\\\

\\\\\

---

[9]  These x-rays also indicated no acute injury of the sacrum or coccyx, despite a previous coccyx fracture.  There was also no abnormality of the right ankle.  (Id.)

1      D.  <u>Whether the ALJ Overlooked Evidence Regarding Side Effects of Medication in</u>

2  <u>Determining Plaintiff's Residual Functional Capacity</u>

3        Plaintiff next asserts that his medications, including Flexeril, have slowed him

4  down, and that since drowsiness and fatigue are two side effects of this drug, the ALJ should

5  have considered them in determining plaintiff's residual functional capacity.

6        There is no evidence other than plaintiff's own testimony that his medication

7  decreased his energy level.  (Tr. at 265.)  Nevertheless, the ALJ is not entitled to simply ignore

8  the only evidence on the issue.

9      E.  <u>Testimony of Plaintiff's Lay Witness</u>

10        Plaintiff takes issue with the ALJ's treatment of the daily activities questionnaires

11  completed by plaintiff's mother.  An ALJ is required to "consider observations by non-medical

12  sources as to how an impairment affects a claimant's ability to work."  <u>Sprague v. Bowen</u>, 812

13  F.2d 1226, 1232 (9th Cir. 1987).  "Lay testimony as to a claimant's symptoms is competent

14  evidence that an ALJ must take into account, unless he or she expressly determines to disregard

15  such testimony and gives reasons germane to each witness for doing so."  <u>Lewis v. Apfel</u>, 236

16  F.3d 503, 511 (9th Cir. 2001) (citing <u>Nguyen v. Chater</u>, 100 F.3d 1462, 1467 (9th Cir. 1996)).

17  Similar to the ALJ's role in evaluating the testimony of a claimant, when evaluating the

18  testimony of a lay witness "[t]he ALJ is responsible for determining credibility, resolving

19  conflicts in medical testimony, and for resolving ambiguities."  <u>Sousa v. Callahan</u>, 143 F.3d

20  1240, 1243 (9th Cir. 1998) (quoting <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1039 (9th Cir. 1995)).

21        The Ninth Circuit has just held that the ALJ must properly discuss lay witness

22  testimony, and that any failure to do so is not harmless unless no reasonable ALJ, when fully

23  \\\\\

24  \\\\\

25  \\\\\

26  \\\\\

1   crediting the testimony, could have come to a different disability determination.  Stout v.

2   Commissioner, 454 F.3d 1050, 1053 (9th Cir. July 25, 2006).[10]

3           In this case, the ALJ did not mention the two questionnaires provided by

4   plaintiff's mother, dated January 22, 2002 and August 6, 2002 ((Tr. at 116-21, 110-15.)  The

5   earlier questionnaire recounts plaintiff's activities, including helping with meals, watching

6   television, taking a nap, grocery shopping with the assistance of his sister, and some yard work.

7   Plaintiff's mother also described his antisocial behavior.  (Id. at 116-21.)  The second

8   questionnaire details how plaintiff no longer takes care of the yard, no longer helps with meals,

9   and no longer does grocery shopping.  (Id. at 110-11.)  This August 6, 2002 question contradicts

10  in part plaintiff's hearing testimony of July 1, 2003, in which he testified that he does about two

11  hours of yard work, and helps his mother in the kitchen.  (Tr. at 265, 266.)   The ALJ did not

12  mention these questionnaires, but did discuss plaintiff's testimony.

13          The Commissioner points out the discrepancy in Ninth Circuit case law regarding

14  consideration of lay testimony.  Stout, relying on Dodrill, states that an ALJ *must* consider lay

15  witness testimony.  454 F.3d at 1053.  The regulation upon which Dodrill relied, 20 C.F.R. §

16  404.1513(e)(2), was replaced in 2005, according to the Commissioner, with § 416913(d)(4),

17  which states that the ALJ *may* consider evidence from these other sources.  The most recent

18  version of this section, effective August 1, 2006, retains this discretionary term.  The

19  Commissioner is correct in arguing that no Ninth Circuit *en banc* decision has been issued since

20  the revision of the above cited regulation; however, Stout is binding authority like Vincent v.

21  Heckler, 739 F.2d 1393 (9th Cir. 1984), the case upon which the Commissioner seeks to rely, but

22  is more recent.  Although the reason for Stout's reliance on case law interpreting outdated

23  regulations is unclear, the fact remains that it is controlling authority on the issue.

24  _____

25       [10]  It should be noted that although plaintiff refers to these questionnaires as testimony,
     they are not sworn statements.  Stout and the cases upon which it relies, are directed toward
     testimony.  See Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir.1993); Nguyen v. Chater, 100 F.3d

26  1462, 1467 (9th Cir.1996) (citations omitted); Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001).

These observations were required to be discussed, especially in light of the discrepancy between them and plaintiff's testimony.  The court cannot say, given the record, that no reasonable ALJ would not have found them significant in the analysis.

F.  <u>Whether the ALJ's Step Four Vocational Finding Lacked Substantial Evidence</u>

Plaintiff alleges that the ALJ failed to provide a specific DOT listing for his conclusion that plaintiff can perform his past work as cook, and that there are numerous cook type positions which are medium level work.

The United States Dept. of Labor, Employment & Training Admin., Dictionary of Occupational Titles (4th ed. 1991), ("DOT") is routinely relied on by the SSA "in determining the skill level of a claimant's past work, and in evaluating whether the claimant is able to perform other work in the national economy."  <u>Terry v. Sullivan</u>, 903 F.2d 1273, 1276 (9th Cir. 1990).  The DOT classifies jobs by their exertional and skill requirements.  It is used by the SSA to classify jobs as skilled, unskilled, or semiskilled.  (<u>Id.</u>)  Each job is assigned a number reflecting  how long it generally takes to learn the job, termed "specific vocational preparation" ("SVP") time.  (<u>Id.</u>)

 The DOT is a primary source of reliable job information for the Commissioner.  20 C.F.R. § 404.1566(d)(1).  This circuit, however, has found that the DOT does not necessarily control over vocational expert testimony.  <u>Johnson v. Shalala</u>, 60 F.3d 1428, 1436 (9th Cir.1995) ("It was . . . proper for the ALJ to rely on expert testimony to find that the claimant could perform the two types of jobs the expert identified, regardless of their [DOT] classification").

Here, the ALJ found that plaintiff could perform past work as either fry cook or cook's helper because they are both medium unskilled work which do not require climbing, kneeling, crawling, or crouching.  (Tr. at 35.)  The ALJ did not list the corresponding DOT numbers for these two jobs.

The job of fry cook is most likely intended to fall within DOT classification number 526.685-014, and cook helper is best described within DOT number 317.687-010,

1  although there are additional cook type jobs descriptions.  See e.g. DOT 529.687-050 (cook

2  helper in canning and preserving industry).  Therefore, plaintiff's question is easily resolved.

3  Harder questions have been raised by the ALJ's failure to give clear and convincing reasons to

4  reject certain limitations assessed by examining doctors and the effect of these limitations on

5  plaintiff's past work.  See previous discussion in Section C.

6          The regulations define medium work as including standing or walking for six

7  hours of the work day, with sitting "intermittently during the remaining time."  SSR 83-10.  As

8  aptly posited by plaintiff, "in most medium jobs, being on one's feet for most of the workday is

9  critical."  (Id.)  The DOT does not specify the breaks allotted for fry cook (DOT 526.685-014) or

10  cook helper (DOT 317.687-010 or DOT 529.687-050), which were the jobs the ALJ found

11  plaintiff could do based on his past work.  These job descriptions also do not indicate the amount

12  of sitting involved or whether and to what extent the worker is permitted to alternate between

13  sitting and standing.[11]  Because medium work normally involves only intermittent sitting, a

14  determination needs to be made whether plaintiff can do his past work based on the need for

15  breaks every two hours as recommended by Dr. Spin, and/or alternating positions every hour as

16  suggested by Dr. Nuccion.

17          In this case a vocational expert is necessary to determine whether plaintiff can do

18  his past work if he had additional limitations of either having to alternate sitting and standing

19  every hour or taking breaks every two hours, depending on which opinion the ALJ chooses to

20  rely.  If plaintiff cannot do his past work with these additional restrictions, the ALJ will have to

21  proceed to step five to determine what other work plaintiff can do with these restrictions, as well

22  as the additional restrictions of only occasional climbing, stooping, kneeling, and crouching, as

23  opined by Dr. Nuccion, or limitations on frequent bending, crouching, climbing, or kneeling as

24  _____

25  [11]  The job description for fry cook does not require any climbing, stooping, kneeling, crouching or crawling.  The cook helper descriptions do specify that stooping and crouching are occasionally required.  Therefore, these postural limitations imposed by Drs. Nuccion and Spin

26  have been accommodated by these jobs.

1 determined by Dr. Spin.[12]

2    Plaintiff's bending limitation as observed by Dr. Spin, was also ignored by the

3 ALJ.  See previous discussion in Section C.  Bending is not an activity contained in the job

4 descriptions of fry cook or cook helper.  See DOT 526.685-014, DOT 317.687-010, DOT

5 529.687-050.  Therefore, if the vocational expert on remand finds that plaintiff can do his past

6 work, this omission is of no consequence.  If, however, plaintiff is precluded from his past work

7 and must do other work, the ALJ must either include this limitation in his hypothetical or he

8 must provide a reason why he has not accepted this limitation by Dr. Spin.

9    As discussed in Section C, the ALJ took plaintiff's mental limitations into

10 consideration in determining that he could do his past unskilled medium work.  If on remand it is

11 determined that plaintiff cannot do his past work, then these limitations would have to be

12 factored into the equation of what work plaintiff can do.

13 CONCLUSION

14    The court finds the ALJ's assessment is not supported by substantial evidence in

15 the record or based on the proper legal standards.  Accordingly, plaintiff's Motion for Summary

16 Judgment is GRANTED IN PART, the Commissioner's Cross Motion for Summary Judgment is

17 DENIED, the Clerk is directed to enter judgment for plaintiff, and this matter is remanded to the

18 Commissioner pursuant to Sentence 4 of 42 U. S. C. § 405(g) for development of the record.

19 DATED: 9/26/06

20                    /s/ Gregory G. Hollows

21                    GREGORY G. HOLLOWS
                     U.S. MAGISTRATE JUDGE

22 GGH/076
   Pruitt1205.ss.wpd

23

24

25

26    [12]  Plaintiff cannot do the full range of medium work which requires frequent stooping
   and frequent crouching.  SSR 83-14, 83-10.

19